## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NELSON HERNANDEZ,<br>　　Plaintiff<br><br>vs.<br><br>TOWN OF MILFORD;<br>OFFICER K. RAHN, individually and in his official capacity;<br>OFFICER W. CABLE, individually and in his official capacity;<br>INSPECTOR W. SCHULTZ, INTERIM CHIEF OF POLICE, individually and in his official capacity,<br>　　Defendants. | CASE NO. 3:04-cv-1283(WWE) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

This action arises from plaintiff Nelson Hernandez's allegations of the deprivation of both federal and state constitutional rights pursuant to 42 U.S.C. sections 1983 and 1988 and Article One, sections 7, 8 and 9 of the Connecticut constitution, negligence, recklessness and gross negligence, and intentional infliction of emotional distress. Plaintiff also asserts the Town's liability pursuant to Connecticut General Statutes sections 52-557n and Connecticut General Statutes section 7-465. Defendants Town of Milford, Officer K. Rahn, Officer W. Cable and Inspector W. Schultz have moved for summary judgment as to all counts.

## BACKGROUND

On September 13, 2003, plaintiff was registered as a guest at the Turnpike Motel in Milford, Connecticut. At approximately 9:00 p.m., defendant Rahn, of the Milford

1

Police Department, was patrolling the parking lots of hotels and motels in that area. Specifically, he was researching information concerning vehicles in the parking lots of these establishments, checking their license plates with the Connecticut Department of Motor Vehicles data base and the National Crime Information Center ("NCIC"). In the course of such review, Rahn investigated the status of a 2001 Dodge Intrepid. Both the Connecticut data base and the NCIC reported that the vehicle was registered to plaintiff Nelson Hernandez and that this individual was wanted on an outstanding warrant for aggravated assault originating in Rockville, Maryland.[1] The warrant indicated that the suspect was named "Nelson Portillo Hernandez." It also included other identifying information about Hernandez. Rahn decided to stop and detain plaintiff based on this information. He was joined by defendant Cable.

At approximately 10:10 p.m., Rahn and Cable stopped plaintiff, ordered him out of his vehicle, searched him and advised him of the outstanding warrant. In addition to the automobile information and the name on the warrant, defendants also were able to observe Hernandez's physical appearance and compare it positively to the physical description of Nelson Portillo Hernandez contained in the warrant. Rahn arranged for a field fingerprinting of plaintiff and compared them to a record of plaintiff's fingerprints taken in Port Chester, New York, on October 8, 1994, a "hit" that had shown up in the search of plaintiff's name. These fingerprints had been taken in conjunction with plaintiff's arrest for driving under the influence in Port Chester, a charge for which he

---

[1]The report indicated that Hernandez was armed with a semi-automatic handgun and was wanted for assault in the first degree and reckless endangerment. Defendants' Ex. A.

never had been convicted.

Rahn placed plaintiff under arrest and transported him to the Milford Police station. Plaintiff repeatedly told defendants that he was not the individual referred to in the warrant, had never been to Maryland and urged them to check his banking records and to compare his social security number, date of birth and physical description with that of Nelson Portillo Hernandez.

Plaintiff was placed in a holding cell and was subsequently arraigned on September 15, 2003. The State did not offer any additional information regarding the identity of the subject of the warrant and plaintiff was ordered to be held in jail. The State set a $500,000 bond.

On September 16, 2003, while plaintiff was in custody, the Connecticut Post, the local Bridgeport newspaper, printed a story about plaintiff. The article quoted a Montgomery County (MD) Police Department spokesperson who said that plaintiff had displayed a handgun and threatened to shoot an ex-girlfriend and then left the scene. The article also identified plaintiff as the subject of the warrant, provided plaintiff's age and home address and referred to a Milford Police Department spokesperson, Officer Vaughan Dumas, who said plaintiff had been traced to the Turnpike Motel on the Boston Post Road, near Interstate 95. Plaintiff's Ex. E.

On September 20, 2003, plaintiff appeared in Superior Court. The State still did not have any additional information regarding Nelson Portillo Hernandez and plaintiff remained in custody.

On September 23, 2003, plaintiff's counsel requested that a photograph of plaintiff be taken and sent to Rockville, Maryland in order to conduct a comparison

3

between plaintiff and Nelson Portillo Hernandez. Upon review of this photograph, the victim of the alleged assault asserted that plaintiff was not the subject of the warrant. Shortly thereafter, plaintiff was released from custody.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American International Group, Inc. v. London American International Corp., 664 F. 2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 242, 91 L.Ed.2d 202 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 24.

**I.     Probable Cause**

"Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause." Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991). It is necessary that the arresting officers have probable cause or a reasonable belief that the individual named and described within the warrant is indeed the individual they are placing under arrest. Powe v. City of Chicago, 664 F.2d 639, 647 (7th Cir. 1981).

However, there is no constitutional guarantee that only the guilty will be arrested and an arresting official is not required by the Constitution to investigate independently every claim of innocence. This includes a claim based on mistaken identity. Baker v. McCollan, 443 U.S. 137, 145 - 146, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

In the present case, the Court will not determine whether probable cause existed in order to justify plaintiff's arrest. For the purposes of this ruling, the Court will assume that no probable cause existed. However, defendants are entitled to qualified immunity and may not be held liable.

**II.    Qualified Immunity**

Even if defendants are not entitled to summary judgment on plaintiff's claim that they lacked probable cause for the arrest, they are entitled to qualified immunity. The doctrine of qualified immunity bars suits against government officials unless their actions violate clearly-established rights and that an objectively reasonable official would have been aware of this violation. Zieper, et al. v. Metzinger, et al., 2007 WL

122016, *5 (2d Cir.). "The qualified immunity defense is intended to strike a fair balance between 1) the need to provide a realistic avenue for vindication of constitutional guarantees, and 2) the need to protect public officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Lee v. Sandberg, 136 F.3d 94, 100 (2d Cir. 1997).

The scope of qualified immunity is broad. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

The test for qualified immunity is twofold and must be considered in sequence. The threshold question is whether, taken in the light most favorable to plaintiff, the facts demonstrate the official's violation of one of plaintiff's constitutional rights. The next question is whether that constitutional right was clearly established within the specific context of the case. In other words, the court must consider whether the constitutional right was so evident that a reasonable officer would understand that his actions would violate that right. Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id. at 201.

When a plaintiff alleges an arrest without probable cause, qualified immunity may stand as a defense if it was either objectively reasonable for the officer to believe that probable cause existed for the arrest or if other officers of reasonable competence could disagree on whether probable cause was satisfied. Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991).

### 1. Officer Rahn

In the present case, even if there had been a violation of plaintiff's constitutional rights, Rahn would be entitled to qualified immunity in that he reasonably and objectively believed that probable cause did exist and that his arrest of plaintiff was lawful and constitutionally sound.  In light of the information available to the officer – the facts surrounding the warrant and the comparison of plaintiff to the descriptors included therein –  even when construed in the light most favorable to plaintiff, an officer reasonably could have believed that probable cause did exist and that it was proper to arrest plaintiff.

At all times relevant, defendant Rahn exhaustively searched for information to bolster his suspicion that plaintiff was the same individual wanted pursuant to the Maryland warrant.  He ran plaintiff's license plate through his mobile computer and was informed that the registration plate of the car belonged to "Nelson Hernandez" and that he was wanted on a felony arrest warrant from Maryland. He confirmed this information with the Milford Police Department's dispatch center.  After checking with the front desk of the motel as to the driver's license number for the operator of the vehicle, Rahn entered that number into the NCIC system.  The NCIC responded with a "hit" that the Connecticut operator's license was connected to the same person who was wanted on the Maryland warrant.  He once again confirmed this information with the Milford Police Department's dispatch center, requesting that they enter the same license number into their computer.  The results were the same: the operator's license number correlated to the person wanted in Maryland.  Armed with this information, Rahn decided to stop the owner of the vehicle.

Rahn stopped plaintiff's car and explained the reason for the detention. Plaintiff denied that he was the same "Hernandez" as the suspect named in the warrant, "Nelson Portillo Hernandez." Despite these protestations, plaintiff did not possess any documentary information to confirm this.[2]

Rahn did not minimize the significance of plaintiff's protestations. He took the following steps: 1) he called the dispatch center, asking them to find out if the State of Maryland's Montgomery County Maryland Police Department ("MCMPD") had a photograph of the individual described in the warrant;[3] 2) he asked the dispatch center to run the FBI number the NCIC had provided and determine where else "Hernandez" had been arrested; 3) when Rahn learned that plaintiff had been arrested in Port Chester, New York, he requested that a photograph of plaintiff be sent from the Port Chester Police Department;[4] 4) he asked the dispatch center to find his supervisor and requested that the supervisor come to the scene to assist him; 5) he asked that a trained fingerprint analyst come to the scene to take plaintiff's prints and compare them to the fingerprint classification noted on Hernandez's file as produced by the NCIC system; and 6) he observed plaintiff's physical features and personal data and compared them positively to those of the individual described in the NCIC report. From these procedures, Rahn determined that there was probable cause to arrest plaintiff.

---

[2] Despite the contrary assertion in his complaint, plaintiff admitted in his deposition that he had not provided Rahn with any "banking documents" that would allegedly support his claim that he was not in Maryland at the time of the crime.

[3] There was no photograph available.

[4] Again, there was no photograph available.

Plaintiff argues that his arrest was unreasonable based on the following allegations.  First, he asserts that the birth date listed in the warrant was May 10, 1953, not his actual birth date: May 10, 1963.  He argues that because the teletype containing the 1963 birth date was time stamped 2330 hours (11:30 p.m.) and that an earlier teletype, stamped 2233 (10:33 p.m.) had listed the 1953 birth date, his arrest at 2303 (11:03 p.m.) was erroneous.  Rahn points out that earlier teletypes time stamped as early as 2110 (9:10 p.m.) – the time at which Rahn ran plaintiff's registration plate – referenced the wanted individual's birth date as May 10, 1963.  A teletype stamped 2147 (9:47 p.m.) also listed the 1963 date of birth. Accordingly, the proper year of birth – 1963 – was known and relied upon by Rahn at the time Rahn stopped plaintiff (10:10 p.m.) and at the time of plaintiff's arrest.  In light of the fact that three teletypes contained the proper date (including two received prior to plaintiff's arrest), it is evident that Rahn reasonably relied upon the 1963 date.

Plaintiff also focuses on the allegation that at the time of the arrest, 11:03 p.m., defendants did not know his social security number.  However, as early as 9:10 p.m., Rahn was in receipt of the original NCIC teletype which included the suspect's social security and FBI numbers.  Defendants' Ex. D and E.  These numbers were found to match plaintiff's.  Defendants' Ex. B, Rahn Deposition, p. 34, lines 2-3.

Plaintiff asserts that at the time of his arrest, defendants were not in possession of his fingerprint classification.  This is incorrect.  Rahn obtained fingerprints from the Port Chester, New York Police Department prior to the arrest.   Rahn took the additional step and requested that a fingerprint expert come to the scene in order to take plaintiff's fingerprints, determine the classification and compare them to these prints.  The

comparison was positive. This turned out to be a fruitless comparison because plaintiff admitted that the fingerprints from Port Chester were his, but claimed that they had no bearing on the fingerprints of the suspect named in the warrant. Although this was true, there is no indicia that at the time of the comparison, Rahn had any reason to believe the test was not relevant to plaintiff's arrest.

Finally, plaintiff claims that the physical description of the wanted "Hernandez" differed enough from his appearance as to undermine the reasonableness of his arrest. The only arguably substantive distinguishing feature, however, was the color of plaintiff's hair – black and graying – compared to the "brown" hair cited in the description of "Hernandez." [5]

Considering these factors in their totality, Rahn reasonably believed that he had probable cause to arrest plaintiff. He is entitled to the protection of qualified immunity.

Rahn is also entitled to immunity in his individual capacity. Public officials sued in their individual capacity are entitled to qualified immunity from suit unless "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Even assuming that there was a constitutional violation, the official is still entitled to immunity if he objectively and reasonably believed that his actions were lawful. Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004).

Rahn would still be entitled to immunity even if there had been a violation of

---

[5] The other compared characteristics include, inter alia,: eye color (brown), approximate height (5'9" and 5'10"), approximate weight (190 and 210). The Court finds these comparisons adequate to support the reasonableness of Rahn's belief that the plaintiff and the individual named in the warrant were the same person.

plaintiff's constitutional rights. He had every reason to rely on the information he had obtained regarding the warrant and plaintiff's identity and he reasonably and objectively believed his actions were lawful.

### 2. Officer Cable

Even assuming that plaintiff did suffer a constitutional violation, he presents no facts that could support any claim against defendant Cable. It is necessary for a party to allege facts sufficient to establish that there is a tangible connection between a defendant's actions and the injuries allegedly suffered by a plaintiff. Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986). Cable merely was present at the time of plaintiff's arrest. Plaintiff has not presented any facts that suggest that Cable was anything other than that which Cable claims to have been: the cover officer responsible for Rahn's safety, not responsible for the arrest itself. Plaintiff does not provide any facts that suggest that Cable even had any awareness that plaintiff may have been falsely arrested. Accordingly, plaintiff cannot support his claim that Cable in any way violated his constitutional rights. Summary judgment as to Officer Cable is, therefore, warranted.

### 3. Inspector Schultz

Plaintiff asserts that defendant Schultz is liable for his alleged constitutional violation pursuant to the doctrine of supervisory liability. In order to be found liable in his supervisory capacity, plaintiff must assert facts that demonstrate a constitutional violation on the part of the official. See Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999). In order to hold a supervisor liable for a constitutional violation, plaintiff must

demonstrate that the supervisor: 1) directly participated in the underlying tort; 2) failed to remedy the violation upon learning of it; 3) established a custom or policy fostering the violation or allowed such custom or policy to continue after learning of the violation; or 4) was grossly negligent in the supervision of the subordinates who committed the violation.  Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997).  Plaintiff presents no facts or evidentiary support that satisfy any element of this test and mere speculative allegations are not sufficient to survive summary judgment.  Burgess v. County of Rensselaer, 2006 WL 3729750, *10 (N.D.N.Y.).  Schultz cannot be held liable because there is no indication of his involvement in the alleged tort committed by his subordinates. Similarly, plaintiff provides nothing that would deny Schultz individual immunity.

    **4.    Town of Milford**

"Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  Monell v. Dept. of Social Services of the City of New York, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  A municipality cannot be held liable for the conduct of others.  To hold a municipality liable for the acts of its employees as opposed to liability for its own actions would be to impose liability pursuant to the doctrine of respondeat superior, which § 1983 does not contemplate.  In order for a municipality to be held liable, an action must exist that has caused a constitutional violation and for which the municipality is actually responsible.  This action must be one that has been officially sanctioned or ordered.  Pembaur v. Cincinnati, 475 U.S. 469, 479 - 80 (1985).

In the present case, plaintiff claims that the Town of Milford, through the acts of a

spokesperson for the Police Department, exhibited custom and practice in that this spokesperson revealed to the Connecticut Post that plaintiff had been arrested. Defendants argue that there are no material facts to support plaintiff's claim. Plaintiff makes no reference to a specific policy or custom that would demonstrate that the incident in question was representative of same. Conclusory statements are not sufficient to avoid summary judgment. Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980).

### III. Intentional Infliction of Emotional Distress

In order to establish a claim for intentional infliction of emotional distress, plaintiff must establish: 1) that defendant intended to inflict emotional distress, or he knew or should have known that emotional distress was the likely result of his conduct; 2) that defendant's conduct was extreme or outrageous; 3) that defendant's conduct was the cause of plaintiff's emotional distress; and 4) that the emotional distress suffered by plaintiff was severe. Golnik v. Amato, 299 F.Supp.2d 8, 14 -15 (D.Conn. 2003) (dismissing claim of intentional infliction of emotional distress).

In order to assert a viable claim, plaintiff must allege conduct that "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Goldfarb v. West Hartford, 2007 WL 290283, *16 (D.Conn.).

Here, plaintiff does not satisfy the first two prongs of the test necessary to succeed on a claim for intentional infliction of emotional distress. He alleges that he suffered emotional distress due to the article published in the Connecticut Post. There is no evidence that the Town or its spokesperson intended to inflict emotional distress

13

by means of the publication of this article or the dissemination of the information contained therein.  The information included in the Post article was consistent with the information gleaned from the Milford Police Department and there was no reason to doubt the veracity of such information.   As a result, it is not possible either to consider that there was any intent to cause emotional distress or to label such conduct "atrocious."  The spokesperson was fulfilling his job and disclosing information that there was every reason to believe was true.  While it is evident that such publicity would cause distress, plaintiff provides no evidence that would show that this was the intent of the Town or its spokesperson.

While it is arguable that plaintiff's unfortunate 11-day incarceration could be construed as "outrageous," neither party has raised this issue in the filed papers. However, even if such a claim were to be considered, plaintiff's demand for damages would fail because he does not satisfy the test.  It was reasonable for defendant Rahn to believe that plaintiff's arrest was warranted and, therefore, there is no evidence that it was conducted out of an intention, awareness or desire to inflict such distress.  It is reasonable that plaintiff was incarcerated.  Similarly, while the State could and probably should have acted more expeditiously, there is no evidence that their possibly dilatory actions were the result of any ulterior motive to cause distress.

## IV.     State Law Claims

Pursuant to 28 U.S.C. section 1367(c)(3), the Court will decline to exercise its supplemental jurisdiction over plaintiff's state law claims because it has dismissed all claims over which it has original jurisdiction.

14

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment [Doc. #46]. The Clerk is instructed to close this case.

SO ORDERED this 22nd day of February, 2007 at Bridgeport, Connecticut.

_____/s/_____
Warren W. Eginton
Senior United States District Judge